HCDTMAIS

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4            v.                          16 CR 522 (RJS)

5  PASQUALE MAIORINO,

6            Defendant.

7  ------------------------------x

8                                        New York, N.Y.
                                         December 13, 2017
9                                        10:00 a.m.

10
   Before:
11
                    HON. RICHARD J. SULLIVAN,
12
                                         District Judge
13

14                        APPEARANCES

15 JOON H. KIM
        Acting United States Attorney for the
16      Southern District of New York
   AMANDA KRAMER
17      Assistant United States Attorney

18 CHARLES CARNESI
        Attorney for Defendant
19

20

21

22

23

24

25

HCDTMAIS

1          (In open court, case called)

2          THE COURT:  Good morning.  We're here for sentencing.

3    Let me take appearances for the government.

4          MS. KRAMER:  Good morning, your Honor, Amanda Kramer

5    for the government.

6          THE COURT:  Ms. Kramer, good morning.  And for the

7    defendant?

8          MR. CARNESI:  Good morning, your Honor, Charles

9    Carnesi appearing for Mr. Maiorino.

10          THE COURT: Yes, Mr. Carnesi.

11          Good morning, Mr. Maiorino.

12          THE DEFENDANT:  Good morning, your Honor.

13          THE COURT:  So good morning to you, and we have some

14    family and friends here as well?

15          MR. CARNESI:  Yes.

16          THE COURT:  So welcome.  This is a public courtroom,

17    so everybody is welcome here, but I'm sure your presence means

18    a great deal to Mr. Maiorino.  Some of you wrote me letters,

19    I'm sure, some of you at least, so thank you for doing that.

20    Letters like yours are important.  They give me a lot of

21    information that I wouldn't otherwise already have about a

22    person who I've met a couple of times but only in a very sort

23    of artificial setting, so to get letters from people who know

24    him better is helpful.  So thanks for doing that.

25          As I said, we're here for sentencing.  So Mr. Maiorino

1  pled guilty before me on May 17, so I want to go over with you

2  now everything that I reviewed and received in connection with

3  sentencing.  If I left anything out, let me know.

4        So I have, first of all, the transcript of the guilty

5  plea that took place on May 17.  I was here, but I think it's a

6  good practice to go back and review what was said, so I have

7  done that.  I reviewed the transcript of the proceeding we had

8  on August 1st.  That was a bail proceeding that resulted in

9  Mr. Maiorino being bailed for purposes of getting some dental

10 treatment, so I reviewed that as well.

11       I reviewed the presentence report that was prepared on

12 August 11.  That report is 32 pages long.  It includes a

13 sentencing recommendation from the probation office.  I

14 reviewed a number of submissions related to Mr. Maiorino's

15 dental work, so there was an August 30 letter that attached an

16 August 27 letter from his dentist with photos of things.  I

17 also received a September 1st letter from the government

18 related to the same, another September 1st letter from

19 Mr. Carnesi really more about scheduling than anything else,

20 but then I got a September 27 update from Mr. Maiorino's

21 dentist, and then on November 27 an update from the dentist as

22 well.

23       I have the sentencing submission from Mr. Carnesi,

24 which is dated November 29.  That is a two-page submission that

25 then attaches a number of letters, including a letter from

1    Mr. Maiorino himself and various friends and family members,

2    including, I'm sure, some whom of here today.  So I read all

3    those.

4         I then have the government's sentencing memorandum

5    which is dated December 7, and that includes -- well, that is a

6    four-page, single-spaced letter, and there was also a consent

7    money order of forfeiture which was entered on May 17, the same

8    time as the guilty plea, and that calls for Mr. Maiorino to

9    forfeit $10,000 in substitute assets, which were the proceeds

10   of the crime charged in the indictment.

11        So is there anything else that I overlooked?

12        MS. KRAMER:  No, your Honor.

13        MR. CARNESI:  No, your Honor.

14        THE COURT:  Okay.  So let's start with the presentence

15   report.  Mr. Carnesi, you received a copy of the report and

16   reviewed it with your client?

17        MR. CARNESI:  Yes, we did.

18        THE COURT:  Do you have any objections to what is in

19   the report?

20        MR. CARNESI:  No, your Honor.

21        THE COURT:  Ms. Kramer, do you have any objections to

22   what is in the presentence report?

23        MS. KRAMER:  No, your Honor.

24        THE COURT:  So Mr. Maiorino, you may remember on the

25   day you pled guilty I told you that there were certain factors

1  that a judge has to consider in deciding what is an appropriate

2  sentence.  Do you recall that?

3          THE DEFENDANT:  I do, your Honor.

4          THE COURT:  Were any of you folks here that day back

5  on May 17, some of you?  Many not, some perhaps.

6          Anyway, I'm going to remind Mr. Maiorino what we

7  talked about, and if you were here I guess you'll be reminded,

8  too; and if you weren't, you'll hear for the first time what

9  we're talking about.  I think it's important that you

10  understand what is going on if you care enough to be here, and

11  obviously you're affected by the sentence, too, I think it's

12  important that this process be one that you could understand

13  what is going on.

14          So I will try to make sure that we all speak clearly

15  and loudly and not using jargon that makes this hard to follow.

16  Because this is a public event, it's on the record, and you get

17  a transcript, anybody can walk in, and it's important that we

18  make this proceeding understandable, particularly for people

19  who will be affected by it, some who are here and some who may

20  not be here but will certainly be affected by it.

21          So one of the things we talked about, Mr. Maiorino,

22  was the sentencing guidelines.  Do you recall that?

23          THE DEFENDANT:  I do, your Honor.

24          THE COURT:  And so I think held up a big book, and

25  this is the sentencing guidelines, it's a manual, it's about

1   600 pages long, it's put out by a commission.  The commission

2   is the United States Sentencing Commission.  It includes some

3   judges, some lawyers, and some experts in the field of criminal

4   law.  And the way it works is this book is designed to give

5   guidance to judges like me who have the responsibility to

6   impose sentences on human beings.

7       And so the way it works is that every crime or type of

8   crime is covered by a chapter in this book, and the judge,

9   before sentencing, is directed to go to the chapter that

10  relates to the crime involved in the case, and once in that

11  chapter, the judge is prompted to make certain findings of

12  fact, and based on those findings, the judge assigns points.

13  And it's sort of like accounting in some ways, it's fairly

14  technical.  But it's a process designed to be transparent and

15  to be predictable.  And so that's what it is.  Its mathematical

16  precision perhaps is overstated, but nonetheless, the judge

17  makes certain findings, assigns points, adds points, in some

18  cases substracts points, and the judge comes up with a number,

19  and that number is the offense level.

20      The judge then goes to another chapter in this book

21  and that's the chapter that relates to criminal history.  And

22  not surprisingly, people who have been convicted of crimes

23  before and people who have a been sent to prison for those

24  crimes before, they will typically be treated more harshly than

25  a person with no prior convictions.  So the judge goes to

1   chapter on criminal history, the judge makes findings about

2   whether there were prior convictions; and if so, when they

3   were, how long the sentence was.  And depending on the answers

4   to those questions, the judge assigns points.

5           The judge then comes up with another number, and that

6   numbers number is referred to as the criminal history category.

7   There are six criminal history categories.  Category one is the

8   lowest and least serious, category six is the highest and most

9   serious.  And then with those two numbers that I talked about,

10  the offense level on the one hand and the criminal history

11  category on the other, the judge goes to the back of this book

12  where there's a table or a grid.  You probably can't see it,

13  but it's a chart, basically.

14          There's a column here on the far left, that's the

15  offense level column, it's numbered one through 43.  The judge

16  goes down that column until he or she gets to the number that

17  the judge found to be the offense level.  The judge then goes

18  across the other columns from left to right, each of which

19  reflects a criminal history category.  And the judge keeps

20  going until he gets to the criminal history category that the

21  judge found to be appropriate.  So once the judge's finger

22  finally stops in this chart, well, that is the range that, in

23  the view of the commission that prepares this book, would be

24  appropriate, and it's set forth in terms of months.

25          Now I don't have to follow this book.  I'm free to

1    sentence above or below the range that's in this book.  But I

2    do have to consider this book and I have to make my findings

3    under the book and announce the range.  So sort of the starting

4    point for sentencing is this book.  So we'll spend a few

5    minutes talking about this book and how it applies in this

6    case.

7           There are other factors just as important as this

8    book, we'll talk about those in a minute, but the book is

9    important.  So we'll chat about that.

10          Any questions so far, Mr. Maiorino?

11          THE DEFENDANT:  No, sir.

12          THE COURT:  So according to the presentence report,

13   and no one seems to object to it, so I think everybody is in

14   agreement, the base is offense level for this crime is level

15   18, so that's pursuant to Section 2B3.2A of the sentencing

16   guidelines.  So base offense level of 18, plus two more levels

17   because the offense involved an express or implied threat of

18   death, bodily injury or kidnapping, that's a two level increase

19   pursuant to 2B3.2B1.  There's then an additional one-level

20   enhancement because the amount of money that was demanded as

21   part of this extortion was more than $20,000 but less than

22   $95,000.  So that results in a one-level increase pursuant to

23   2B3.2B2 and 2B3.1B7B.  So that takes us to a grand total of 21.

24          Now because Mr. Maiorino pled guilty before trial,

25   because he accepted responsibility for this crime, he's

1  entitled to a reduction.  Under the guidelines if you plead

2  guilty, if you accept responsibility, I subtract some points.

3  So in this case I will subtract three points pursuant to

4  Section 3E1.1.  So that puts us down to level 18.

5       Now in this case the parties agreed as part of the

6  plea agreement that if Mr. Maiorino and 37 other defendants all

7  pled guilty by a certain deadline in May, if they all did that,

8  the government agreed they would recommend that the Court

9  reduce the another level from the offense level, and the

10  defendant agreed.  It turned out that all 37 or 38 defendants

11  did plead guilty by that deadline, so the government has made

12  that recommendation.

13       Now I'm not bound by that.  I wasn't part of the plea

14  agreement, I didn't negotiate it, so I don't have to go along

15  with it.  But it seems to me that in this case it makes sense

16  to do that.  This was a case with 46 defendants.  It would have

17  been very labor intensive and resource intensive to try all 46

18  defendants, or even half that number would be a lot.  So to get

19  the vast majority to plead guilty pursuant to plea agreements,

20  certainly did have a benefit of preserving resources and

21  streamlining a process that could have been very complicated.

22  So I think a one-level reduction is appropriate in light of

23  that savings of resources and in light of the efficiencies that

24  resulted.  So if it had been more than that -- I probably

25  wouldn't have agreed to more than that, but one level strikes

1    me as appropriate.  I will reduce an extra level, and that puts

2    you at level 17.

3         Now with respect to criminal history, there is an

4    unfortunate criminal here.  So Mr. Maiorino has a number of

5    convictions.  The first was from 1978 when he was just a kid,

6    and that was trespassing in the Bronx, resulted in a sentence

7    of 15 days or $50 fine, looks like he paid the fine.  It's too

8    old and too insignificant, it doesn't count.

9         A couple of years later -- the arrest was 1979, the

10   conviction was 1981, Mr. Maiorino was convicted of manslaughter

11   in the first degree and assault in the first degree, which

12   resulted in -- I'm a little confused about this one.  It says

13   it resulted in a sentence of six to 18 years imprisonment and

14   then four to twelve years on Count Two.  But it looks like

15   Mr. Maiorino spent more than 18 years in prison.

16        I guess I don't need to really resolve that today, but

17   I guess I was confused how he spent more time in prison than

18   the maximum sentence.  Were they consecutive?

19        MR. CARNESI:  No, Judge.  My understanding was that

20   the conviction was actually for murder in the second degree for

21   which he received a 20-year sentence.

22        THE COURT:  That's what it said in some of the letters

23   but that's not what it says here in the presentence report, and

24   nobody objected, so that's why I was confused.  Again, I don't

25   think it matters for purposes of sentencing guidelines, it's

1    three points either way, but I was confused by that.  And

2    Mr. Maiorino was on parole until 2013 for that crime.

3           In 2015 Mr. Maiorino was arrested and charged with

4    being a felon in possession of firearms in this district, in

5    the Southern District of New York, in front of Judge Marrero, I

6    believe, and was sentenced to 30 months imprisonment, followed

7    by a three-year term of supervised release.  So you just

8    completed that term of imprisonment I guess in the summer, but

9    that's another three points under the criminal history section

10   of the guidelines.

11          And then there's an additional two-level enhancement

12   or two point addition because Mr. Maiorino committed the crime

13   charged in this indictment while he was a under criminal

14   justice sentence, which was the parole on the state case.  So

15   that's another two points that leads to a total of eight points

16   and puts Mr. Maiorino in criminal history category four.

17          So everybody agree with that?

18          MR. CARNESI:  Yes, your Honor.

19          MS. KRAMER:  Yes, your Honor.

20          THE COURT:  So 17, criminal history category four, is

21   a sentence of 37 to 46 months, so a little over three to a

22   little less than four years, according to this book.

23          Now as I said, I'm free to sentence above or below

24   that.  I'm not bound by this book.  But there are other factors

25   that I have to consider.  And so Mr. Maiorino, you may remember

1    what some of those were.  I'll remind you.  First of all, one

2    of those factors I have to consider is your own personal

3    history.  So I have to consider not just this book, I have to

4    consider you as a person and your whole experience from your

5    birth right until now, and that includes everything.

6            You're a complicated guy like everybody else, so it

7    includes your childhood, your educational history, your work

8    history, it includes your family circumstances today, it

9    includes your health, it includes the testimonials I received

10   about you, people telling me what kind of person you, all that

11   matters, your generosity and kindness.  Those are considered,

12   too, and I have to consider the whole person.  I have to tailor

13   this sentence to you as an individual, and so that's an

14   important factor that I have to take into account.

15           I also, of course, have to consider the facts and

16   circumstances of this crime.  This is a really serious crime,

17   and so I have to make sure that the sentence I impose reflects

18   the seriousness of the crime.  In other words, just as I have

19   to tailor the sentence to you as an individual considering your

20   whole experience, I also have to tailor this sentence to the

21   particulars of this crime, not just what it's called, not just

22   what the numbers are under the book, but what exactly went on

23   here.  What did you do, for how long, why did you do this, how

24   much money was involved, what harms were caused, who else was

25   involved, what was their role relative to yours, all of that

1  matters, and all of that is part of assessing your culpability

2  for this crime and to make sure that the punishment fits the

3  crime and to make sure that the sentence I impose promotes

4  respect for the law.  That's another factor I have to consider.

5  Another factor that I have to consider is the need to

6  deter or discourage you and others from committing crimes like

7  this in the future.  And this is the hope, that by imposing a

8  sentence on you today I will send a message, a message to you

9  and a message to other people, maybe some in the courtroom here

10  today but probably mostly people who are not in the courtroom

11  but who might be considering whether it makes sense to engage

12  in this kind of conduct.  And the hope is that you and they

13  will both say wow, think about what happened to Maiorino, it's

14  not worth it, the penalties are too high, the consequences too

15  grave, it's just not worth it, don't do it.  And the hope is

16  there will be less crime as a result.  It will affect -- my

17  sentence today will somehow have an impact on future behavior

18  and deter or discourage future crimes.  That's hope.  I don't

19  have a crystal ball, I can't know for sure what impact my

20  sentence will have on future behavior, but I have to use my

21  best judgment for that.  That's one of the things that criminal

22  sentences have been designed to do for thousands of years,

23  really, is to have an impact on future conduct.  So that's

24  another factor I have to consider.

25  I have to consider your own needs while you're in

1   custody.  So every defendant that I impose a jail sentence on

2   probably has some needs, some have more particular needs than

3   others, so some have medical needs.  But this is a case with 46

4   defendants.  I sentenced at least 25 so far.  And many of them

5   are in their 70s, one is in his 80s.  So some of these folks

6   have very serious medical issues, that if I impose a jail term,

7   those issues have to be addressed because it would be life

8   threatening otherwise.

9          I have a lot of other defendants in other cases who

10  are much younger who don't have those same physical health

11  issues, but they may have mental health treatment needs, or

12  very frequently substance abuse treatment needs.  Some,

13  frankly, need opportunities to get educational programs or job

14  training.  And so whatever the needs, I have to make sure that

15  those needs are addressed while a person is in prison; the hope

16  being that when they're done with their sentence they will be

17  in a position to succeed, that they won't be worse off, that

18  they might in fact be better off because they have addressed

19  some of the things that may have been holding them back or

20  inducing them to engage in destructive behavior.  So that's

21  another factor I have to consider.

22         Finally, the last factor that I have to consider, in

23  addition to all those others, is the need to avoid unwarranted

24  sentencing disparities among similarly situated people.  That

25  just means before I impose a sentence on Mr. Maiorino in this

case, I have to take a step back and make sure that the

sentence I impose here is consistent with the sentences imposed

on other individuals in similar cases, cases involving similar

crimes by defendants with similar histories and backgrounds.

Now no two people are exactly alike, so it's

impossible to say these two guys should be treated exactly the

same because they're exactly alike.  There are always

differences.  But where there are real strong similarities,

it's important that the sentences should be similar.  If

sentences were all over the place and some people got clobbered

and some people got almost nothing and it depended what judge

you had or who the lawyers were or what courthouse you landed

in, this one or the one in New Jersey, that would probably be

arbitrary and promote disrespect for the law.  It would make

people wonder what is going on here, it's a roll of the dice.

So it's important that we avoid that.  We want to make sure

that the system is consistent and respected.

I have to make sure that the sentence that I impose

does justice to each of them, which is sometimes tough, because

some of those factors are in tension with each other.  Some

might argue for a more lenient sentence.  He's a good guy, a

good father, he's charitable, a hard worker.  Others might

argue for a harsher sentence.  This is your third felony

conviction involving other felonies that were really serious,

to say the least, and this is a really serious crime.

1    So there are some tensions here.  The hard part is

2  balancing.  So we're going to spend a little bit of time

3  talking about that now.

4    What we'll do is I think I'll first hear from the

5  lawyers.  I will give Mr. Carnesi an opportunity to make any

6  arguments he thinks are appropriate in light of the different

7  factors or any other arguments he wants to make.  I will then

8  give Ms. Kramer an opportunity to respond and to make her own

9  arguments.  And after all that, I will give you, Mr. Maiorino,

10  an opportunity to address the Court, if you want.  You have

11  already written me quite a lengthy letter.  If you want to rely

12  on that, that's fine, but if you would like to say more, you

13  have a right to do that, and you would be very welcome to.  So

14  I will give you that opportunity.

15    Now there is a victim in this case.  Victims have a

16  right to be heard at sentencing either in person or in writing.

17    So Ms. Kramer, is there any victim statement or

18  anything from the victim in this case?

19    MS. KRAMER:  No, your Honor, there is not.

20    THE COURT:  All right.  Have you communicated to the

21  victim that he had a right to be here and a right to address

22  the Court?

23    MS. KRAMER:  I did not personally, your Honor, but I

24  understand that the government did, and that offer was

25  declined.

1      THE COURT:  Okay.  So I will, I guess, want to talk a

2  little bit at some point about the victim, because certainly

3  Mr. Maiorino suggests that this is a victim who was not

4  terribly traumatized by this.  So anyway, we have a lot to talk

5  about.  We're in no hurry.  It's an important day for

6  Mr. Maiorino.  It's an important day for his family and for

7  friends.  So we're going to take the time we need to do this

8  carefully and thoughtfully.

9      So Mr. Carnesi, let me hear from you.  Is anything

10  that you would like to say with respect to sentencing?

11      MR. CARNESI:  Yes, your Honor.  First of all, we would

12  like to thank the Court for giving Mr. Maiorino the opportunity

13  to address his dental problems.  I think, as the reports from

14  the dentist have shown, there were very serious problems.  He's

15  made great progress in dealing with them, although there is

16  still some work to be done.

17      THE COURT:  I'm a little confused actually in sort of

18  what is to be done and how that would work with a prison

19  sentence.  In other words, if he were to go back in in a

20  month's time or so, that is going to have an impact on some of

21  the plans.  Some of the plans that the doctor laid out in his

22  November 27th report talk about things happening over the next

23  several months, which would be tough to do in the event of a

24  further prison sentence, which I think some prison sentence is

25  clearly going to happen.  There are things scheduled for

1    March 2018 that will require four to six months for integration

2    is what he said, and so I don't know if the doctor has sort of

3    thought this through, what is to be done in the event of a jail

4    term.

5              MR. CARNESI:  I believe he has, Judge.  But not to get

6    ahead of myself, what we would be requesting, since

7    Mr. Maiorino is presently out on bail, is that he be given a

8    surrender date sometime around the end of March or the very

9    beginning of April.  That will allow the doctor to complete the

10   work that he described here.

11             THE COURT:  But then I thought he said he needs four

12   to six months for the integration, and I don't know if that

13   requires follow ups and things.

14             MR. CARNESI:  I don't believe that it did, Judge.  I

15   believe what he's talking about is that from that point on it

16   would be at least four to six months before they could do

17   anything additional.  But by the work that he would be able to

18   complete by the end of March or April, although it would still

19   be considered temporary, he expects that that would enable

20   Mr. Maiorino to go forward for the next two years or more

21   without any substantial problems.  He would expect that that

22   temporary work, that he would finish by the end of March, would

23   generally preserve his dental health for the next couple of

24   years.

25             THE COURT:  Okay.

1      MR. CARNESI:  If there's any other questions, Judge I

2  want to make very clear, the doctor -- the dentist has been

3  more than cooperative.  He offered to be present today,

4  although it was a regular office day for him, but he would be

5  more than willing to come to court if the Court feels that it

6  needs any further information from him.

7      THE COURT:  I assume you're able to convey on his

8  behalf what the plan is, so I think you have done that.

9      MR. CARNESI:  Thank you.

10     Judge, just to follow up on something that you said in

11  terms of considering the specific offense, the specific conduct

12  for which Mr. Maiorino was being sentenced here today, rather

13  than the label that may appear in the sentencing guidelines, we

14  submitted a very brief letter to the Court which I think frames

15  the issue as we would like to present it to the Court.  This

16  isn't the standard extortion case.  The money that was owed to

17  Mr. Maiorino was owed to him as reimbursement for unfinished

18  work.

19     THE COURT:  I get that.

20     MR. CARNESI:  Okay.

21     THE COURT:  Look, so most extortion relates to illegal

22  proceeds or debts, right, so somebody who has either gambled

23  and lost and is on the hook for money and is getting extorted

24  to repay or somebody who borrowed money at extortionate rates

25  and has fallen behind and now is getting leaned on and

1  threatened to pay back.

2        MR. CARNESI:  Or, in other instances, it could be

3  someone paying protection money to continue to run a business.

4  What I'm trying to say --

5        THE COURT:  This is not that, but the same threats are

6  being made.

7        MR. CARNESI:  Correct, Judge.  And that's the reason

8  why he pled guilty, that's the reason why he recognizes the

9  seriousness of it.  And there was no question but that his

10  conduct in allowing people to go and commit these threats on

11  his behalf was criminal, but the money was taken from

12  Mr. Maiorino under false pretense over six years before there

13  was ever any attempt to collect the money.  He basically wrote

14  it off, forgot it, wasn't worth it, and just said okay, I have

15  been taken for $30,000, I'm going to have to live with it, and

16  that's what he did.

17        THE COURT:  I guess so, but I mean the government's

18  letter gives a little more detail than what's in the

19  presentence report and certainly what's in your letter about

20  what Mr. Maiorino's role was.  And it wasn't that he just let

21  people do this, he spoke to them, he told them what to do and

22  explained -- told them what to explain to the victim, and the

23  language is pretty bad.

24        MR. CARNESI:  Without question.  And again, that's why

25  it's a criminal case and that's why he pled guilty.  But in my

1    letter, and I think clearly in his plea, he acknowledged that

2    he knew that threats were going to be issued, he acknowledged

3    that he was aware of that and took party to that.  But again, I

4    don't think you can lose sight of the fact that the money that

5    was taken was his money and he did nothing to collect it for

6    six years.

7              Subsequent to that, Mr. Rubio, who was acting on

8    behalf of the government, came to him and suggested that he

9    would collect the money along with another individual.  And

10   again, there was no question about the means that were going to

11   be used, but it wasn't until six years later that he was

12   approached by Mr. Rubio that he even made an attempt.

13             He made a tremendous error in judgment, there's no

14   doubt about that, but at the time he had some issues with a

15   failing business, and that money which he had virtually written

16   off, suddenly became more significant, and he gave in to the

17   temptation, and that's what he's here for.  But he didn't do

18   this on his own.  He made no effort to do it up until Mr. Rubio

19   and this other individual approached him.

20             Additionally, Judge -- and I think also this is

21   confirmed in the government's submission, that the whole thing,

22   when Mr. Rubio approached Mr. Maiorino to collect this money,

23   and supposedly had gotten permission from another individual,

24   Mr. Parrello, that was just the case -- it wasn't even the

25   right Patty Boy.

1          THE COURT:  The permission was granted on the basis of

2     a misunderstanding.

3          MR. CARNESI:  Yes.

4          THE COURT:  But the fact is that Mr. Maiorino stood to

5     benefit from this and he put the wheels in motion, right?

6          MR. CARNESI:  No.

7          THE COURT:  This is the government's letter, and maybe

8     everybody should know this because it's not maybe readily

9     known.  So I guess Mr. Rubio and somebody else goes and visits

10    the victim three.  Victim three tells them that he doesn't have

11    the money for Maiorino.  Another person owes him money is what

12    he says.  And so they then invoke the name of Parrello, and say

13    Parrello says you got to pay, you better pay, and I would

14    advise you very, very, very much not to go against it.  And

15    victim three says yeah, I got it, it's like the judge putting

16    fucking guilty 20 years, have a nice life.

17         So when told about that exchange, Mr. Maiorino

18    responded that victim three should have got slapped.  And then

19    Mr. Maiorino tells Rubio and the other person that they should

20    put gambling machines or a sports betting clerk in the bar to

21    take bets as a way of making money to repay Mr. Maiorino.  So

22    that suggests that he's not just trying to get his money back,

23    that he has a plan to put in slot machines, which are not

24    legal, in the bar, so he has access somehow to those.

25         But then he gives advice to how this ought to happen.

He tells these guys, who are the muscle, that you have to be

firm, you have to be assertive.  You can't show the fangs but

you got to know the fangs are there.  You can growl a little

bit, and then you say listen to me, you're get yourself into a

pickle, you're not going to be able to get out.  This is no

joke now.

And then after that, Mr. Maiorino says that victim

three is making me look like an expletive monkey.  He then says

that later he tells Rubio and the other guy that they better

get the victim isolated.  And then he asks Rubio and the other

guy if they have ever used a zapper or stun gun.  He explains

that they should, quote, fuck him up, fuck him up, fuck him up

bad.  If they found him alone they should hold the back of his

head and nail his fucking jaw.  Come into that fucking bar

tomorrow, we're starting it up in there, you don't have a

fucking choice here, you're going to pay.  We may take the

fucking bar from you.  I will bring a fucking army tomorrow.

That's what is being said.

And then he later says, after the victim made a

counteroffer of paying $2,500 a month for a year, Mr. Maiorino

said no, not doing that, and then he says I'm a firm believer,

use logic and reason, and when all else fails, God hope they

have medical insurance.  Meaning this guy is going to get

beaten up, right?

MR. CARNESI:  The language is horrible, Judge.

1    THE COURT:  It's pretty bad.  It's hard to square with

2    the letters I received.  It's hard to square with the

3    testimonials of what a stand-up guy Mr. Maiorino is.  This is

4    the talk of a violent man.  And when you combine that with a

5    guy who has a prior murder conviction and spent 20 years in

6    jail and then after this is in possession of a firearm, that is

7    a pretty bad picture.

8    So that's the problem you have.  The debt may have

9    been legitimate, like a household debt.  It was the debt for a

10   contracting job.  Lots of people have debts like that.  But

11   most people have to go to small claims court or they have to go

12   to court to resolve those things, they don't get to resort to

13   threats and stun guns and force.

14   MR. CARNESI:  But that was not -- Judge, the only

15   point I'm trying to make, for whatever significance you may

16   attach to it, is that was not his original reaction.  Until the

17   government came to him in the form of Mr. Rubio and suggested

18   that they would go about collecting those debts, he sat back

19   and made no attempt to threaten or intimidate anybody in any

20   way.

21   Circumstances changed over the years since he

22   originally lost that $30,000.  The business failed, that money

23   became more significant, and he admitted he made a very serious

24   mistake for which he has pled guilty and is about to be

25   sentenced.  But I do think that those two factors are

1    significant in how he came to be here before this Court today.

2           With regard to the reference to putting in gambling,

3    the conversation is more than that.  The conversation is about

4    Mr. Rubio reporting that Julio says he's not making any money

5    in here, in the bar, he suggested -- he knows Julio is a

6    gambler.  He also suggested to them that there's a kitchen in

7    the bar, maybe they can open up the kitchen and generate more

8    money for the bar that way.

9           With regard to his refusal to accept the proffered

10   $2,500 payments, his rationale was Julio had a history of

11   breaking his financial commitments, and what he wanted to see

12   is rather than trying to get four or five payments of $2,500

13   before Julio again did not pay, he wanted to see if he could

14   front load them, take 4,000 or 5,000, knowing that Julio was

15   only likely to make few payments.  That was his rationale.  He

16   wasn't being unreasonable about refusing a good faith offer to

17   make these payments.

18           THE COURT:  I had a question about Mr. Maiorino's

19   letter.  He says you will read statements from Mr. Julio

20   stating that this debt is not a gambling debt, that he and I

21   were tight, and will describe that we had a relationship.  I'm

22   not sure what statements that's referring to.

23           MR. CARNESI:  Judge, I think what he anticipated,

24   having gone over all of the discovery, I don't think that's an

25   issue, to be honest with you.  I think in the government's

letter they acknowledge how this debt came about.  There are

tape recordings in which Mr. Julio is saying guys, you

understand this is not a gambling debt.

            THE COURT:  That's referring to --

            MR. CARNESI:  To discovery.

            THE COURT:  To the discovery, okay.

            Go ahead.

            MR. CARNESI:  Judge, essentially that's the thing that

I would focus on here, that it is different than the guideline

anticipated type of extortion.  I do think, not a defense, we

never interposed this as a defense, nor would we, it's not

entrapment but the reality of it is it was six years, and if

the government doesn't go there through Mr. Rubio to suggest

this whole thing about trying to collect this debt or whatever,

in all likelihood it doesn't happen.

            And the reason I feel confident in saying that is

because it was six years, he made no effort, he never contacted

Julio, he never tried to threaten him, he never did anything of

the sort.  And I also do think, Judge, although, yes, this may

happen all too frequently where a contractor takes money and

doesn't complete the job, runs away with the money, if it

happens to a particular individual, it's very frustrating.

            THE COURT:  I'm sure it happens all the time, I think,

but most people don't resort to violence or the threats of

violence.

1          The other question I had is with respect to the

2    firearms conviction which postdates the conduct here.

3          MR. CARNESI:  Yes.

4          THE COURT:  The sentencing was before this, but the

5    conduct postdates this conduct.  There are several intonations

6    in the letters that I received that this is -- the reasons why

7    he had those guns are there were extenuating circumstances for

8    possessing those firearms.  I'm not sure that I fully grasp it.

9    It's sort of vague assertions.

10         MR. CARNESI:  I can proffer to you what I believe that

11   those individuals are referring to.  There were three people in

12   the car that night, one of them was his young godson.  He came

13   to be in the car with the gun because he had gotten a call from

14   his godson that he had had problems with some individuals in

15   the area and that he had gotten guns and was going to look to

16   address those problems in some way, or at least at a bare

17   minimum be prepared to protect himself.  When he got that call,

18   he was furious about the idea that this kid was in possession

19   of the guns and made arrangements to pick up the kid with the

20   guns, and they were going to toss the guns in the water where

21   they were stopped, where they were parked at the time, to get

22   rid of the guns.

23         Now I would only say to you, Judge, that in terms of

24   any skepticism of anyone who may have about this particular

25   explanation for how that came to be, that the night -- as soon

1    as they were arrested, the godson and Mr. Maiorino both made

2    statements, separately interviewed, explaining that those were

3    the circumstances.  Ultimately, Mr. Maiorino pled guilty

4    because he knew that it was wrong for him to be in the car

5    knowing that there were guns in the car.  The case against the

6    godson was dismissed in the Bronx State Court on speedy trial

7    basis.

8              THE COURT:  He had no priors?

9              MR. CARNESI:  Yes, he had no priors.  That is my

10   understanding.  I didn't represent him, but my understanding is

11   he had no priors.

12             And again, he was furious, Mr. Maiorino was, with the

13   idea, because he understood where that led him, and he didn't

14   want to see his godson going down the same path.

15             THE COURT:  And this was argued to Judge Marrero?

16             MR. CARNESI:  No, Judge, it wasn't, because as a fact

17   he knew that there were guns in the car, he put himself in that

18   car, and he was legally in possession of those guns.

19             THE COURT:  Well, that's true, but that would still be

20   an extenuating fact, don't you think, if the goal was to

21   dispose of them?

22             MR. CARNESI:  If I were representing him at the time,

23   Judge, I may have, but I did not represent him in that case.

24             THE COURT:  I didn't see any argument like that in the

25   sentencing before Judge Marrero.  Maybe the government, are you

1  aware of any discussion of that?  Are you aware of those facts?

2          MS. KRAMER:  Your Honor, I'm not.

3          THE COURT:  Okay.

4          MR. CARNESI:  I can tell you, Judge, I did see the

5  police reports, and they reflected the statements I just

6  represented.

7          THE COURT:  All right.  Anything else you would like

8  to say, Mr. Carnesi?

9          MR. CARNESI:  I think that's it, Judge, thank you.

10          THE COURT:  All right.  Ms. Kramer, anything you would

11  like to say?

12          MS. KRAMER:  Yes, thank you, your Honor.  First, on

13  just some logistical matters that were raised at the outset of

14  Mr. Carnesi's comments, the government would not object to a

15  surrender date at the end of March or early April.  That was

16  something that we contemplated when opposing the request to

17  adjourn this sentencing until the dental work was completed.

18          And one of the government's arguments to your Honor

19  was that we could move forward with the sentencing, and if

20  there is a little extra time that is needed for surrender to

21  accommodate additional procedures, then that could be

22  considered by the Court.  We would object to anything past that

23  point, but if we're talking about two extra months to allow a

24  procedure, that's not something that the government would

25  object to.

1    THE COURT:  Saying the end of March, are you okay with

2    that?

3    MS. KRAMER:  I think so, your Honor, given that the

4    Court allowed Mr. Maiorino to be out on bail to attend to these

5    procedures over the government's objection.  In that time

6    period he reportedly is in compliance with all of the

7    requirements that are on him, understanding that he is facing

8    significant time.  And so without any reason to question the

9    statements of his dental providers that this additional

10   procedure is necessary that is scheduled for March, the

11   government doesn't object to having that done.

12   THE COURT:  All right.

13   MS. KRAMER:  There is no dispute that this debt was

14   not criminal in nature, that it was incurred sometime in the

15   past in connection with work done on the defendant's home.

16   THE COURT:  Does that make a difference?  That's the

17   question.  Mr. Carnesi is suggesting -- more than suggesting,

18   he's arguing that the fact that this was a legitimate debt,

19   that Mr. Maiorino did nothing to collect -- did nothing

20   illegally to collect until your informant sort of pitched the

21   idea is something that should be relevant to sentencing.

22   MS. KRAMER:  So I don't think so, your Honor, and

23   here's why:  If there were a basis to argue actual entrapment,

24   which I understand the defendant is not doing, but he would

25   have to establish that he did not hold himself out as open to

1    committing the crime of extortion.  The fact that they're not

2    alleging entrapment I think speaks volumes about this

3    defendant's position.

4          THE COURT:  Legal entrapment is hard to prove, it's

5    affirmative defense and it's difficult.  I don't know that

6    there's enough here to prove entrapment.  But I guess this

7    should be not the legal defense of entrapment but rather an

8    argument that it makes Mr. Maiorino less culpable than your

9    typical garden variety defendant charged with and convicted on

10   extortion.

11         MS. KRAMER:  That would be true, your Honor, in the

12   government's view, if there were resistance on the part of the

13   defendant and he relented after some additional prodding.

14   That's not what seems to have happened here.  He seems to have

15   responded with enthusiasm, if you will, and vigorously

16   participated in this extortion.

17         The fact that the underlying debt was not criminal in

18   nature doesn't affect, in the government's view, the

19   defendant's culpability, because the crime is in the collection

20   of the debt.  So legitimate or illegitimate, I think the

21   conduct that is relevant is what the defendant said and what

22   the defendant did in collecting the debt.

23         Now it is true, as defense counsel suggests, that the

24   victim was close or friendly with the defendant in this case.

25   The victim took the threats seriously, but has not expressed to

HCDTMAIS

1  the government the -- as your Honor raised, whether he was

2  traumatized, he has not expressed that he was traumatized, and

3  essentially describes himself as a tough guy.

4        So he took the threats seriously, not surprisingly, I

5  think, given --

6        THE COURT:  Well, he took the threats seriously, but

7  he didn't do what they asked him to do, he neither put in the

8  machines nor paid the money, right?

9        MS. KRAMER:  That's true, your Honor.

10       THE COURT:  So that's not a defense either, but --

11       MS. KRAMER:  That's true.

12       THE COURT:  -- seems to be a relevant fact.

13       MS. KRAMER:  It's relevant, your Honor, because

14  obviously the harm that was caused by the crime is something

15  that the Court should consider.  But the fact that there was in

16  a way the inverse of the eggshell plaintiff here, an especially

17  tough extortion victim, again doesn't undermine the seriousness

18  of the defendant's own words and the defendant's own actions.

19       I think that the recordings speak for themselves, and

20  the defendant's conduct does show a very concerning level of

21  comfort with violence and with encouraging acts of violence in

22  a way that requires a guidelines sentence to appropriately

23  address the seriousness of the offense and to effect general

24  deterrence as well as specific deterrence.

25       THE COURT:  All right.  I guess another question

1    that's worth considering is had Mr. Maiorino been charged and

2    prosecuted of this offense and the weapon offense at the same

3    time, which could have happened, what would that sentence have

4    looked like?  Have you thought about that?

5         MS. KRAMER:  I have, your Honor.  I don't actually

6    think that -- because of the gap in time between the two

7    offenses, I don't think that would look like one sentence as

8    those the guns were possessed during the extortion.

9         THE COURT:  They would be separate crimes, but if they

10   were charged at the same time and sentenced at the same time,

11   the guidelines -- I guess there would be a grouping analysis, I

12   presume.  Do you agree with that?

13        MS. KRAMER:  There would be a grouping analysis.  It's

14   an interesting question, your Honor, because I think that the

15   sentence that the defendant received in connection with the gun

16   case is --

17        THE COURT:  He got 30 months.

18        MS. KRAMER:  Yes, your Honor.

19        In some ways that is addressed in this case by virtue

20   of the criminal history points that were added in, because it

21   does make him a more serious recidivist defendant.  I think the

22   Court would consider that and factor that in even if were

23   calculated differently under the guidelines.

24        THE COURT:  This conduct happened before that offense.

25        MS. KRAMER:  Right.

1          THE COURT:  If this happened after that offense but he

2     was charged and prosecuted at the same time, then you would

3     argue that the recidivism is probably worse.

4          MS. KRAMER:  Well, I think either way you have someone

5     who engaged in extortion in 2012 and then was possessing

6     firearms as a convicted felon.

7          THE COURT:  Right.  But the possession of firearms,

8     according to him -- and I'm looking now at the submissions, I

9     couldn't get the transcript, but the submissions do reflect

10    that -- whether true or no, I'm not sure, but Mr. Maiorino and

11    his godson both said Maiorino was there just to help dispose

12    them, to get rid of them; not to use them, not to keep them, to

13    throw them in the water so they would never be seen again.  I

14    don't know if that's true or not, but that's what the

15    consistent explanation was.  That's not your typical felon in

16    possession case either.

17         Judge Marrero sentenced him to 30 months.  The

18    guidelines range was 33 to 41, I think, so he mustn't have been

19    too moved, but I'm just curious as to what the guidelines you

20    think would have been had he been sentenced at the same time.

21         MS. KRAMER:  I haven't done the calculation, your

22    Honor, but I think that in that circumstance the government

23    would be arguing that the defendant's criminal history,

24    although not yet captured by virtue of the two crimes being

25    charged together although disparate in time, should affect the

1    Court's sentencing in terms of severity so that the Court does

2    take into account that he has continued to engage in very

3    serious crimes.

4            THE COURT:  I agree with that.  I'm just saying that

5    even now there are two full sentences; whether he was sentenced

6    at the same time, even if you discounted or added, I suppose,

7    the extra risk of recidivism that's reflected in the additional

8    criminal history would have been a combined probably lower

9    sentence.

10           MS. KRAMER:  Your Honor, if I may, my understanding

11   from one of my colleagues who was on that felon in possession

12   case is that the guns were not in the trunk.

13           THE COURT:  I don't think they were in the trunk.

14           MS. KRAMER:  They were not sort of separate in the car

15   in a way that they were not accessible, so --

16           THE COURT:  They were accessible.  They are in the

17   passenger compartment of the car.  They were where the godson

18   had been sitting.

19           MS. KRAMER:  Yes, and there were also robber's tools

20   in the car.

21           THE COURT:  And it was Mr. Maiorino's car?

22           MS. KRAMER:  I believe that's true, your Honor, but I

23   don't know.

24           THE COURT:  That's what the presentence report said

25   that wasn't objected to then.

1          MS. KRAMER:  So I just think the context calls into

2     the question the notion of what was being done with the guns at

3     the time, notwithstanding the fact that the two people caught

4     with the guns had the same explanation for why they had them.

5     I don't know that there is any other support for that

6     explanation, and the presence of robber's tools in the car

7     suggests otherwise.

8          THE COURT:  Well, that may be what Judge Marrero was

9     thinking.  I'm not sure because I don't have his transcript,

10    but I do have the presentence report and the submissions, which

11    do reflect at least a consistent story.

12         MS. KRAMER:  To address your Honor's sort of core

13    issue here, I think the answer is that the overall guidelines

14    sentence would likely be less if the case were sentenced for

15    both offenses at the same time than if you're looking at 30

16    months plus 37 to 46, I think that's true.

17         THE COURT:  Is that relevant to sentencing here?

18    You're arguing for a guidelines sentence, but it's not usually

19    the case that somebody is sentenced for conduct that predated a

20    subsequent conviction and sentence.

21         MS. KRAMER:  That's true.  It's an unusual set of

22    circumstances.

23         THE COURT:  Right.

24         MS. KRAMER:  I don't think -- I think it's relevant,

25    of course.  It's not something that shouldn't be taken into

1  account because it impacts the defendant's criminal history,

2  the Court's evaluation of his recidivism, and the fact that he

3  served time for that crime.  But I don't think that it

4  justifies a below guidelines sentence in this case because of

5  the seriousness of the conduct here and because of the

6  defendant's recidivism, even taking out of the calculation the

7  guns, the other very serious crimes that he committed.

8          MR. CARNESI:  If I could be heard briefly.

9          THE COURT:  Sure.

10         MR. CARNESI:  The circumstance surrounding that case

11 is that Mr. Maiorino had pled guilty to the guns, and he was

12 about to be sentenced.  I think his sentence date was two weeks

13 prior -- sorry, two weeks past the date that this indictment

14 was filed.  So again, as the Court raised the issue, logically

15 it would have been in his best interest to dispose of both

16 cases at the same time.  He didn't have the opportunity to do

17 that because he was unaware this indictment was coming down at

18 the time that he was awaiting sentence on the other case, I

19 guess more significantly, at the time he pled on the other

20 case.

21         THE COURT:  Wait a minute, the sentencing in this

22 case, in the Maiorino case, was September 16 of 2016.

23         MR. CARNESI:  Yes.

24         THE COURT:  So that was after the indictment came down

25 in this case.

1        MR. CARNESI:  That's correct, but that's my point,

2   Judge, he pled guilty, he was awaiting sentence, was a week or

3   two, whatever it was, away from sentence, and then he gets this

4   new indictment.  Had the new indictment come down a month

5   earlier, in all likelihood he would have disposed of both cases

6   at the same time.

7        THE COURT:  I don't know why that couldn't have been

8   done in August, he couldn't have said hey, I know we have a

9   sentencing, Judge, but let's put that off because we'll try to

10  wrap this up and get this all sentenced at once.  I don't know

11  why that wasn't done.  That would have, I think, been the

12  smarter way to go.

13       MR. CARNESI:  Exactly, it would have been a much more

14  prudent way to go.  And the resolution would have been -- and I

15  calculated this a while ago because I discussed this with

16  Ms. Kramer before we arrived at this disposition.  I made the

17  same suggestion.  It was rejected.  But in calculating it,

18  although his guidelines for the combined cases obviously would

19  have been somewhat higher, the 30 months that he did in jail as

20  of that sentence would have counted.

21       THE COURT:  I get that.  I can tell you what the math

22  is.

23       Sorry to bore you people.  This is sort of hyper

24  technical, but it does matter in a sense.

25       So the guidelines were -- offense level 19, criminal

1  history category of two in front of Judge Marrero in September

2  of 2016, which was a month after an indictment had already come

3  down against Mr. Maiorino, that resulted in a guidelines range

4  of 33 to 41 months.

5      If -- and this is a big if, no guarantees at the time

6  that was it going to happen, but if Mr. Maiorino could have

7  pled globally in September before sentencing to this count and

8  that count, then it seems to me that what would have happened

9  is you would have had an offense level of 19 on the gun count,

10  an offense level of 17, which I calculated here.  That's

11  assuming the same terms that were negotiated nine months later

12  with the government, including the logjam difference, but even

13  if you didn't give the logjam difference, it would have been

14  18.  So what happened is through the grouping of the

15  guidelines, which is something that most people would never

16  even think about.  And you folks here who are not lawyers, you

17  have a right to be sort of puzzled, but we would be at level

18  21.

19      The criminal history category at that point it seems

20  to me would be level three because he wouldn't have had a prior

21  conviction.  For some reason, I think -- he was in criminal

22  history category two, according to the presentence report in

23  Judge Marrero's case, but it should have been three, I think,

24  because he committed that -- I guess actually that crime was

25  committed after he was off supervision.

1        MR. CARNESI:  Yes.

2        THE COURT:  But in any event, if he pled and got

3   sentenced all together, he would be in criminal history

4   category three with an offense level of 21, which would be 46

5   to 57.  That's my calculation.

6        Do you agree with that, Ms. Kramer?

7        MS. KRAMER:  Yes, your Honor, with a couple of brief

8   caveats.  Yes, if he got the same deal that was ultimately the

9   resolution of the case in May of 2017 when he entered a guilty

10  plea, which had him pleading not to a racketeering count but

11  just to the extortion.

12       THE COURT:  There are things that could have been

13  higher, I agree with that.

14       MS. KRAMER:  Right.  So I think to some extent the

15  fact that he had a higher criminal history by virtue of the

16  other case, that he had already pled guilty to that case, and

17  that this plea resulted from negotiations following the

18  defendant's review of all the discovery and a lot of

19  communications back and forth, I don't think that the terms

20  would have been the same if at that time he had said let's wrap

21  it up.

22       Putting that aside, though, yes, that calculation is

23  correct, your Honor.  But I also think that it's important to

24  consider the fact that at the time the defendant was indicted

25  in this case, having pled guilty in that felon in possession

 1  case, there was not, as your Honor can see from the transcript

 2  and the chronology, an immediate acceptance of responsibility

 3  and guilty plea in this case.  That happened --

 4          THE COURT:  But enough to qualify for the points under

 5  the guidelines.

 6          Here's my point, if I were representing him, it seems

 7  to me -- I'm not faulting anybody or saying there was

 8  ineffective assistance, but it seems to me if I were

 9  representing Mr. Maiorino in the gun case before Judge Marrero,

10  I got an indictment a month before sentencing, I would have put

11  off sentencing and asked Judge Marrero to keep putting off

12  sentencing until I resolved the other case, because it would

13  always be better to be sentenced at the same time because you

14  would get credit for time you're in.

15          MS. KRAMER:  Correct, your Honor.  I don't remember

16  what the exact sequence of events was, but that was something

17  that Mr. Carnesi proposed at some point with the government,

18  and we did not agree with that request.

19          THE COURT:  With respect to the case in front of Judge

20  Marrero?

21          MS. KRAMER:  Yes.

22          THE COURT:  Is that right, Mr. Carnesi?

23          MR. CARNESI:  Yes, your Honor.

24          THE COURT:  So back in August or September you were

25  arguing that the government should allow Mr. Maiorino to defer

1   sentencing in the case before Judge Marrero?

2           MR. CARNESI:  No, Judge, I didn't represent

3   Mr. Maiorino in front of Judge Marrero.  My suggestion was in I

4   guess probably the weeks before we ultimately arrived at this

5   plea agreement was that somehow it would be considered that

6   way.

7           THE COURT:  So your point, Ms. Kramer, is that this

8   plea agreement reflects a determination that the grand total of

9   time will be the combined sentences.  Is that what you're

10  saying?

11          MS. KRAMER:  Yes, your Honor.  And I think there was

12  some request on the part of the defendant in the other case to

13  delay things, I just don't know exactly when that happened, but

14  that may have been just informal communications with the U.S.

15  Attorney's Office.

16          But they are separate cases, and to the extent that --

17          THE COURT:  When did the indictment come down again,

18  early August?

19          MS. KRAMER:  August 2nd, I believe, your Honor, 2016.

20          The resolution in this case reflects, to some extent,

21  an acknowledgment there was a separate conviction and sentence

22  imposed by Judge Marrero.  In addition, I don't know that at

23  the time of the sentencing in the trigger lock case there was a

24  clear sense of how things would play out for the defendant in

25  this case, and so it's not necessarily true --

HCDTMAIS

            THE COURT:  But I'm not supposed to be sentencing him

on sort of his gambling ability, his ability to sense whether

he's better or worse off, I'm supposed to be sentencing him on

the crimes.

            So if what you're saying is the plea you arrived at

was based -- we'll let him plead to just the extortion and not

a racketeering and a lower guidelines range as a result because

we have already baked in the fact that he served 30 months

already and wouldn't get credit for it; if you're telling me

that, that's one thing.  But if you're saying hey, he blew it,

he miscalculated, then I think there's a different equitable

calculus.

            MS. KRAMER:  It is the first, and to a certain

extent --

            THE COURT:  What would -- nobody pled -- virtually

nobody pled to racketeering in this case, right?

            MS. KRAMER:  That's correct, your Honor.  That

certainly was not the prevailing factor.

            THE COURT:  What were the guidelines -- how would the

guidelines have been worse than what they ended up being in

this case?

            MS. KRAMER:  So the base RICO guideline would be 19 --

sorry, I will have to check, your Honor, to give you accurate

answers, because I don't have the notes from --

            THE COURT:  You're saying if he pled to RICO it would

1    be worse, right?

2              MS. KRAMER:  Yes.  I don't want to suggest in any way

3    that but for his conviction and sentence before Judge Marrero

4    we would have said to him you must plead to a RICO count,

5    because that's not, as your Honor observes, what anybody did

6    who pled guilty by the deadline in May of 2017 that was the

7    product of extensive negotiations.  But it did factor in -- the

8    defendant was named in sort of different aspects of the

9    conspiracy, not only the extortion with respect to Mr. Julio,

10   but the -- he ended up with a guilty plea to a single count of

11   extortion, and one of the factors --

12             THE COURT:  I'm trying to figure out would his

13   guidelines have been significantly higher than what they are in

14   this case.  If he pled to racketeering, it would be a base

15   offense level of 19 or the offense applicable to the underlying

16   racketeering activity, which would be extortion.  Was there

17   other underlying activity that was more serious than extortion,

18   or more serious than racketeering?

19             MS. KRAMER:  No, your Honor.

20             THE COURT:  So then it seems to me the offense level

21   would have been 19 under racketeering, which nobody pled to,

22   but if he had, that wouldn't affect the combined guidelines I

23   talked about because he was 19 under the guns and he's 19 here.

24             So I think that's right.  I think it would have

25   resulted in getting credit for the time in for both.  I'm not

1    trying to necessarily make this easy on Mr. Maiorino, I'm

2    trying to play this straight.

3         MS. KRAMER:  Understood completely, your Honor.  It's

4    a little bit hard to speculate what could have been, but it

5    could have been a single plea to a RICO, which would have, as

6    your Honor pointed out, not affected the combined total,

7    because the difference --

8         THE COURT:  Let me make sure that's the case.

9         I'm sorry to all you people.  Generally sentencings

10   are not quite this technical.  This feels like an accounting

11   convention.  But it is important.  If we're starting here as

12   opposed to here, that makes a huge difference in a case like

13   this one.  So that's why we're spending the time doing it.  And

14   I think Mr. Carnesi and Mr. Maiorino I think understand this.

15   Some of you may grasp that we're not just sort of doing this

16   for the heck of it.  But if you're not following, I apologize.

17   But it can be technical, and it's the kind of thing if you

18   don't really know the sentencing guidelines well it's not

19   likely that you will be able to follow the nuances of these

20   arguments, and that's just the nature of having a guidelines

21   system.

22        So here's the deal, it would have been level 20 for

23   the gun, plus two because one of the firearms was stolen, level

24   22.

25        MS. KRAMER:  Apologies, your Honor, I thought you said

1   it was offense level 19.

2          THE COURT:  That's what it was after sentence.  I want

3   it make sure understand this now.  That's what it was in front

4   of Marrero, 20 plus two, and then if it had been racketeering

5   it would have been 19, which then would have been an extra two

6   points.

7          MS. KRAMER:  Still one to four levels less.

8          THE COURT:  24.  It would have been 20 plus two, plus

9   the two that you got under the grouping analysis, plus the two

10  under the gun count, minus three for acceptance.  24 minus

11  three is level 21.  At that point he still would have been in

12  criminal category three, so 46 to 57.

13         MS. KRAMER:  You added the plus two because the

14  offense involved the express or implied threat of death or

15  bodily injury --

16         THE COURT:  No, I'm saying that -- well, it's going to

17  be plus --

18         Hold on.

19         MS. KRAMER:  Before acceptance in this case, your

20  Honor --

21         THE COURT:  Before acceptance in this case we were at

22  21.

23         MS. KRAMER:  Right.

24         THE COURT:  And before acceptance in that case we were

25  at 22.  So he's going to be -- take 22, which is the higher of

1    the two, and add two levels, right?

2           MS. KRAMER:  Right.

3           THE COURT:  One unit for each of the two counts, so

4    that puts him at 24.  24 minus three for acceptance, no

5    question he gets three for acceptance, that puts him at 21.

6    Forget the extra point, that's off, it seems to me, because of

7    the gun conviction, the gun charge.

8           But that's level 21, criminal history category three

9    is 46 to 57, right?  With credit for the time in on both,

10   that's what it would be.

11          MS. KRAMER:  Yes, your Honor.

12          THE COURT:  It's hard for me to see how he would have

13   done any worse in a plea agreement arrangement.

14          MS. KRAMER:  I don't think that in a plea he would

15   have had to plead to additional counts.  At a trial there would

16   perhaps be RICO conspiracy, RICO substantive, substantive

17   extortion, right?

18          THE COURT:  I don't know if they would affect his

19   guidelines.

20          MS. KRAMER:  No, I think -- they may not have.  In the

21   grouping analysis you could end up with potentially one more

22   point for an additional count.

23          THE COURT:  But the extortion is the same -- I'm not

24   sure what -- the same conduct underlying each conviction, I

25   think they would not be grouped separately.

1          MS. KRAMER:  In any event, I want to raise the

2    multiple count option and say that I don't think that even in a

3    plea that was to RICO he would have also had to plea to

4    substantive.  So I don't think that's an issue, but I want to

5    sort of make sure the record is clear that there would have

6    been multiple counts going into the trial.  So there's a

7    possibility that a plea at that early stage where what the

8    defendant is saying is let me plead to this now so I could get

9    sentenced on both of my different cases at the same time,

10   there's some possibility that there would have been an

11   additional count.  It would not have been more serious, offense

12   level-wise, than the RICO.  And so as a result, you could

13   potentially have one additional count that is equally serious

14   that results in one more point for the grouping that would, at

15   worst, take him to an offense level of 22 instead of 21 after

16   acceptance, which would be 51 to 63.

17         So I think look, if you're gaming out what could have

18   happened, I think that is not an unrealistic possibility.

19         THE COURT:  I'm not sure that I would agree there

20   would be the extra point, but in any event, we have a range

21   that we can say I think comfortably is what would have been the

22   range had these cases been resolved together, which they

23   weren't, and which I don't think counsel asked for.  He asked

24   for a brief adjournment after the indictment came down and then

25   they went forward with sentencing.  I haven't noticed in here

1    that Judge Marrero said come hell or high water we're going

2    forward with sentencing.  I think everybody said let's go

3    forward with sentencing now.  I think that was not a wise move.

4          Was Mr. Maiorino in custody prior to this sentencing?

5    He was, right?

6          MR. CARNESI:  Yes.

7          THE COURT:  It's unusual that I have two cases that

8    touch on each other like this.  It's not a typical situation.

9    They asked for an adjournment, he gave it, and then went

10   forward with sentencing a month later.  So I don't think there

11   were any further requests for adjournments, and perhaps it

12   would have been wise do that.

13         All right.  That helps me.  In light of all that,

14   Mr. Carnesi, is there anything that you want to say?

15         MR. CARNESI:  No, your Honor.

16         THE COURT:  Okay.  Mr. Maiorino, as I said, you have a

17   right to address the Court, and you are welcome to but you're

18   not required to.  You wrote me a very thoughtful and lengthy

19   letter, so you may want to rest on that.  Whatever you think.

20         THE DEFENDANT:  I would like to address your Honor

21   shortly.

22         THE COURT:  Okay.  Stay seated.  I think it's easier

23   to speak into the mike.  Keep your voice up nice and loud.

24         THE DEFENDANT:  Thanks for giving me the opportunity,

25   your Honor --

1      THE COURT:  You don't have to thank me, because even

2  if I didn't want to, I would have to.

3      THE DEFENDANT:  But I want to thank you for the bail,

4  because what I did was be able to --

5      THE COURT:  That you should thank me for.

6      THE DEFENDANT:  Big time.

7      THE COURT:  Ms. Kramer gave me a really hard time

8  about that.

9      THE DEFENDANT:  Big time, because I didn't realize how

10  severe it was.  And we're pretty much under the way of

11  addressing most of those problems, but also by granting me the

12  bail --

13      THE COURT:  What's that?

14      THE DEFENDANT:  By granting me that bail you allowed

15  me to spend some time with my wife and my daughter.  That

16  enabled me to see how much I hurt them by my actions.  I'm

17  sorry for that.  I take full responsibility for that.  I will

18  never put them in harm's way ever again.

19      As you mentioned, I wrote you a detailed letter of my

20  life.  I did commit some bad in my life, your Honor.  I did.

21      THE COURT:  You did.

22      THE DEFENDANT:  And I paid for it.  But I tried to do

23  good, a lot of good to try to rectify my past.

24      There are things I could go into that you spoke about,

25  and I think it's well addressed in regards to my history,

1  particularly the gun case.  It is true, I tried to help that

2  boy.  And again, I hurt my own family because of that.

3         I cherish my family, your Honor.  But if you notice,

4  maybe you don't, my daughter is not here today.  I asked her

5  not to be here --

6         THE COURT:  I understand that.  Look, I think --

7         THE DEFENDANT:  -- because I'm ashamed.

8         THE COURT:  -- it's a traumatic thing for a young lady

9  to sit through something like that.

10         THE DEFENDANT:  I'm ashamed of my actions, and I don't

11  want her to see me standing in front of you for my crime.

12  That's not the person that I think I am.  I have done some

13  stuff, but I have done other things as well.

14         I pray for the opportunity to be able to rejoin my

15  family as soon as possible, whatever you think fit, to be the

16  parent that I know I can be, the husband that I know I am, and

17  just go back to living a normal life.

18         Again, your Honor, I take full responsibility.  I

19  don't shirk that at all.  I made bad judgments with regards to

20  this case at hand.  My words were atrocious, but they were

21  words.  Nobody got hurt.

22         THE COURT:  Well, they were pretty atrocious.

23         THE DEFENDANT:  They are.  I admit them.

24         THE COURT:  And they were uttered by a guy who had

25  previously killed a man.

1    THE DEFENDANT:  I know, I know.

2    THE COURT:  You could say it was just tough talk, but

3  it takes a different -- it takes on a different light

4  altogether when being uttered by a guy who has killed another

5  human being and spent 20 years in jail for it.  How could you

6  have thought it was okay to talk that way?  How could you have

7  put yourself in a situation where you knew you were going to be

8  involved in something like that?  That staggers my mind.

9    THE DEFENDANT:  Unfortunately, the timing in my life

10  at that time was poor.  I was going through some changes.  I

11  played a role when I was approached.  I was a fool.  It was

12  very unwise.  And because of that, I know I'm going to have to

13  pay here today.

14    But I guarantee you and I promise you here and now:

15  I'm done.  I am 58 years old.  I got a 17-year-old daughter

16  about to embark in college.  I have been involved in every

17  aspect of her life.  My wife had been with me since I was 15.

18  I let them down.  I just want to get back, put this behind me,

19  pay what I need to pay, and move on.  You will never see me in

20  these courts, I promise you here and now, ever again.

21    That's all I have to say.  Thank you.

22    THE COURT:  All right.  It's almost 11:30.

23    Did you want to say something, Ms. Kramer?

24    MS. KRAMER:  Yes, your Honor, I want to very briefly,

25  for the record, respond on the issue of whether the defendant's

1  counsel in the trigger lock case should have asked to adjourn

2  things and do it one sentencing together.  And I know your

3  Honor made very clear that you're not suggesting that anyone

4  was ineffective in that respect, but I just want to make clear

5  a couple of reasons in addition to what your Honor has said as

6  to why it's not clear that that was not a smart strategic

7  decision.

8          THE COURT:  Okay.

9          MS. KRAMER:  First, I think it was unclear to all of

10  the parties and would have been unclear if the cases were

11  sentenced together which judge would be doing the sentencing of

12  both, and obviously that's a factor that defense counsel takes

13  into account in making those decisions.

14          Second, Judge Marrero did give the defendant a below

15  guidelines sentence in that case.

16          THE COURT:  By three months, yes.

17          MS. KRAMER:  And your Honor has demonstrated obviously

18  a very careful calculation of what the guidelines would have

19  been had the cases been together, and clearly has taken into

20  account that sentence and the different effect it has not only

21  in how much time the defendant has served, but in what his

22  current guidelines calculation is because of the fact it

23  elevated his criminal history to criminal history category

24  four.

25          THE COURT:  Right.

1          MS. KRAMER:  And lastly, the government did take into

2     account in negotiating the resolution in this case the fact

3     that the defendant was serving time in connection with the

4     Judge Marrero case which postdated this conduct.

5          THE COURT:  You say that, but I'm not sure how it

6     would have made any difference.  You say you took that into

7     account, but how would the guidelines have been higher had he

8     not been serving?

9          In other words, if he was like most of other

10     defendants here, you picked him up off the street and he was

11     looking at only these charges, how would the plea offer have

12     been different than what it ended up being, besides the one

13     level logjam reduction?

14          MS. KRAMER:  So I think, your Honor, the number of

15     counts that the defendant would have been asked to plead guilty

16     to may have been different, as your Honor has seen with some of

17     the defendants in the case.

18          THE COURT:  Nobody pled to racketeering that I can

19     think of at all.

20          MS. KRAMER:  That's true, your Honor, but there would

21     have been, in this offense calculation, an additional point for

22     two counts, even if equal or lower value than one to four

23     offense levels.

24          THE COURT:  Gambling, you mean, or what?  What other

25     conduct would you have charged?

                    There's gambling machines that were proposed to be put

into the bar, so maybe gambling, but that's an offense level of

twelve.  So that's -- I don't think that would count, that's

more than nine levels than where we were otherwise.

                    Anyway --

                    MS. KRAMER:  I'm reluctant to go beyond the offense

conduct relevant to what the defendant has guilty to because

that is the count he pled guilty to.  There were some other

references in the indictment to his at the very least being

present when other crimes were discussed and potentially

another extortion, that kind of thing where there could have

been another count.

                    So I'm not suggesting, your Honor, that the government

said look, he's serving 30 months, let's fashion a resolution

in this case that reduces his sentence in this case by 30

months or takes away the criminal history leap, but merely that

one additional component in looking at whether the way that

things were handled in terms of having two sentences was a

smart strategic move is that it did, to some extent, impact the

government's resolution in this case.

                    THE COURT:  That's still not clear to me, but I don't

know that I want to get into it too much.

                    MS. KRAMER:  Fair enough.  Taking away that factor and

discounting it completely, there are a lot of other strategic

reasons that I think support the notion that many highly

1  effective defense counsel would have proceeded to have two

2  separate sentencings, as was done here.

3       THE COURT:  I'm not suggesting that -- it was

4  Mr. Hammock who was lawyer in the first case.  I'm not saying

5  he was ineffective.  I don't think it fell below the objective

6  standard of reasonableness for a lawyer in the profession, nor

7  would I say it would have any prejudice.  It may not have had

8  any prejudice at all.  And it's not clear to me that Judge

9  Marrero would have granted the request to adjourn indefinitely.

10      So I don't know.  I think it's a factor that I can

11 consider and I will consider.  And so what I would like to do

12 now, at the risk of really pushing everybody's patience to the

13 limit, is take a few minutes to reflect on what I heard.  I

14 have been thinking about this case for a long time, as I'm sure

15 has Mr. Maiorino, as I'm sure you have.

16      I got up this morning with a sense of what I would do

17 in this case, because I can't be unprepared or come in

18 oblivious or with nothing in mind, but I always want to be open

19 to hearing things and open to being persuaded, including by

20 statements by the defendant and by counsel.  So I want to take

21 a few minutes to collect my thoughts, to think about what I

22 heard today, to reflect a little on this hyper technical

23 guidelines discussion that we have been having, because it is

24 relevant.  This is not a typical case the way these things go,

25 but it won't be more than a few minutes.

1          If you don't mind coming back or taking a quick break,

2     excuse me for five or ten minutes.  I only get to do this once,

3     and I want to make sure that I do it carefully and correctly.

4          Thanks.

5          (Recess taken)

6          THE COURT:  Thanks for your patience.

7          This is an important day for Mr. Maiorino, it's an

8     important day for you folks.  I understand that.  It's not lost

9     on me that any sentence that I impose on Mr. Maiorino is going

10    affect other people, too, no one more than his daughter and his

11    wife, but lots of people.  That's just the nature of being

12    human, we're connected to each other, and what happens to one

13    person affects others, even others who are innocent.

14         So I view Mr. Maiorino's wife and his daughter and all

15    of you in many ways to be innocent victims of this crime

16    because you are suffering from it, but sadly that is often the

17    case.  It's usually the case.  It's not that unusual that

18    people who are being sentenced, people who committed serious

19    crimes, when they are punishment, that punishment will be felt

20    by other people who did nothing wrong.  And I wish there was

21    something I could do to alleviate that, but sadly that's the

22    reality of being human.

23         This is a case where there is some really serious

24    conduct, no question about that.  I mean I read a little bit

25    from the transcript to just let people know what we're talking

1    about here.  Many of the letters describe Mr. Maiorino as a

2    stand up guy, somebody who shows up with a shovel when it's

3    snowing for elderly neighbors.  That's an admirable thing,

4    somebody who is there for his daughter, somebody who is there

5    for friends and family members, somebody who is lively and hard

6    working, who has a job ready for him, somebody who has always

7    treated me with respect every time we've been in court.  Those

8    are admirable questions.  No question about that.  No question

9    about that.  There's more to this man than his crime or his

10   criminal history.  That's not unusual either.  Everybody I

11   sentence is human, and human beings have capacity for great

12   kindness and great generosity, but also at the same time in the

13   same person often the capacities for more violence and more

14   destructive conduct, and so that's what was going on here, too.

15          So at the same time that Mr. Maiorino was being a good

16   worker and a good father and a good neighbor, he was also

17   talking with other people about extorting a guy who owed him

18   money.  Did the guy owe him money?  Sounds like it.  I have no

19   reason to think he didn't.  Sounds like the guy walked off with

20   the money for a project that he didn't finish, and for that he

21   should have been sued, and for that he should have taken a

22   reputational hit and he should have done what he needed to do

23   to make sure that he followed through on his contract.  But you

24   don't get to threaten him, you don't get to fuck him up, you

25   don't get to stun gun him or nail his jaw, you don't get to

force him to put gambling machines into his restaurant, you
don't get to do that.  You don't.  And you don't get to unleash
guys like the ones you were talking to to do that, even if it's
just to scare him a little.  You don't get to do that.  That's
not what happens in a civil society.  And you don't get to do
that when you've got a prior conviction for a murder.

You, better than anybody, should have known you don't
even get to talk tough.  You don't even get to talk like that
when you've got the record that you have and when you've done
what you did.  And I think you're a guy who is really mindful
of that.  I'm not here to wag my finger and lecture you.  I
have to give my reasons.  A judge in federal court has to
explain himself.  They have to give reasons for the sentence.
And that's because I have a such discretion.  I have a wide
range of sentences to impose, and so I have to justify it and
explain it.  That's the purpose, not to lecture or blather.  In
some ways I think you would like me to say a number and be
done, but I have to make a record for the public and for your
benefit.

So come on, you understand what you did.  You're sorry
for what you did.  You say a day doesn't go by where you don't
think about what you did as a 19 year old, but you certainly
weren't thinking about that when you were having these
conversations about getting back your money and doing what was
necessary to get it.  You were talking like a tough guy,

1    talking like you were on the Sopranos.  Maybe it was an act,

2    maybe it was a bluff, maybe everybody decides when they get

3    together they become a cartoon.  I don't know.  I think there's

4    some of that going on in this case.  I think there's some

5    strange compulsion people have to act the gangster when they

6    all get together.  And some of these folks are real gangsters,

7    no question about that.  But you knew better than this, and you

8    should have known better than this.

9         You have to be punished.  No question about that.  And

10   I'm not suggesting you don't think that.  You said all along

11   you acknowledge you need to be punished.  For me, the issue is

12   how much.  How do I balance those things out?  So we spent a

13   lot of time talking about the guidelines, because it does seem

14   to me the guidelines are supposed to be a starting point.  The

15   guidelines are supposed to give guidance.  They're not a magic

16   cure.  They're not a substitute for human judges.  They're not

17   capable of assessing and weighing all the different nuances

18   that are part of this process.  I don't think we'll ever get to

19   that point.  But they're available.

20        And so I spent a fair amount of time looking at these

21   guidelines and thinking about what these guidelines would have

22   been because this is a case where I have got two sentences, one

23   that was imposed a month after the time in this case, and one

24   that is going to be imposed today for conduct that predated the

25   conduct in that other case, which is also unusual.

1          It seems to me, and I think that the precedent and

2     even the guidelines acknowledge that where, through the fault

3     of no one, I'm not faulting the government, I'm not faulting

4     defense counsel in the other case, I'm not faulting -- I'm not

5     faulting defense counsel in this case, I'm not -- there were

6     reasons beyond the control of any one person to why this case

7     that stems from a period 2012 to 2013 and for some defendants

8     into 2014, in other words, a time period that predated the gun

9     offense before Judge Marrero, there are reasons why it got

10    prosecuted this way and charged this way.  I'm not faulting

11    anybody.

12         But it does seem to me that, generally speaking, a

13    defendant should not be worse off because of those charging

14    decisions and because of the timing of prosecution.  I think,

15    generally speaking, a court should consider and consider

16    carefully what the sentencing range would have been had the

17    matters been prosecuted at the same time, especially when they

18    really were in the courthouse at the same time.

19         So that's why we spent a lot of time going back and

20    forth on this.  It's in some ways impossible to sort of

21    recreate the scene as it existed on September 16 of 2016.  As I

22    said, I'm not faulting anybody, but it does seem to me that --

23    I think it's fair that the guidelines then, or if sentencing

24    had been put off until now for both cases, or if the cases had

25    been charged at the same time, which I suppose they could have

1    been, theoretically, that the guidelines today would have been

2    different.  The guidelines would have been, as I said, a

3    combined total offense level of 21, a criminal history category

4    of three, which would have been 46 to 57 months, and it seems

5    to me that that would have taken into account time served, and

6    that would be an appropriate sentence in light of all those

7    things.  Even if a gambling charge had been added –- and I

8    think that the gambling machines being introduced into the bar

9    could constitute attempted gambling, perhaps, maybe, but that

10   wouldn't have affected the guidelines, which would have been

11   level twelve, ten levels below the highest guideline count.

12           So I'm getting back into math, but I think the reality

13   is that's what the range would have been, and I would have been

14   comfortable sentencing within that range; probably not at the

15   low end given the history, given the criminal history, given

16   the fact that he committed murder, and you don't get second and

17   third bites at the apple with that.

18           So it seems to me that within that range, on these

19   facts, all the facts that are available to me now, including

20   everything before Judge Marrero, I would have sentenced sort of

21   in the middle of thing range, middle to bottom of the range,

22   and so I think I would have sentenced him probably about 50

23   months.  And so that's the sentence I will effectively impose

24   here, minus the time you served.

25           So that means I will be imposing a he sentence of 20

1    months.  I will give you time to surrender.  I think we started

2    this process with the dental work.  You've been compliant with

3    all of your conditions.  You're going to continue to abide by

4    those conditions.  But it seems to me that I am giving a

5    variance here only to reflect what the sentence would have been

6    had everything been charged together, which I think is not

7    irrational, I think that's fair and appropriate.

8            So that's the sentence I intend to impose.  I also

9    intend to impose a term of supervised release of three years.

10   That term of supervised release will include conditions that

11   are set forth in the presentence report.  I won't announce them

12   now, I will when I formally impose sentence.

13           I'm not going to impose a fine.  I will order

14   forfeiture in the amount of $10,000.  That's already been

15   ordered, so I'm formalizing as part of the judgment what has

16   already been ordered, and a $100 special assessment.  So that

17   is the sentence I intend to impose.  Is there any legal

18   impediment to my imposing that sentence, Ms. Kramer?

19           MS. KRAMER:  No, there's not.  Your Honor may need to

20   make clear for the record that the three years of supervised

21   release I believe has to run concurrent.

22           THE COURT:  That's right.  So it would be concurrent

23   to the undischarged term of supervised release that you're

24   technically on now for the gun offense.  So it will be three

25   years starting today.  I guess ultimately it will be three

1  years.  Between the two it will be a little more than three

2  years, because you have technically been on supervised release

3  since you got released back in -- when was it, August you got

4  released?

5          THE DEFENDANT:  Yes.

6          THE COURT:  So yeah, that will be part of the

7  sentence.

8          Is there any legal impediment to my imposing the

9  sentence, Mr. Carnesi?

10         MR. CARNESI:  No, your Honor.

11         THE COURT:  Let me ask you to stand.

12         Mr. Maiorino, having accepted your guilty plea back on

13 May 17, having adjudged you guilty then, having carefully

14 considered all the angles here, I don't think anyone could

15 accuse me of being a slacker on this one, I'm going sentence

16 you to 20 months.  I will give you time to surrender, I will

17 say April -- right after Easter, I think April 3rd.

18         If there's a need for an extra week or something, I

19 may be open to that, but we're not putting this off for months?

20         THE DEFENDANT:  I want to get it done.

21         THE COURT:  As you said in your letter, it's good, but

22 it also means that it will be longer once you go in before you

23 get home.  I will give you until April 3rd to surrender.

24         I'm also going to impose a term of supervised release

25 of three years.  As I said, that term will include the

1    following standard, mandatory and special conditions.  There

2    are 13 standard conditions imposed in every case, I'm going to

3    impose those here.

4         There are mandatory conditions that you not commit

5    another federal, state or local crime.  If you commit another

6    crime while you are on supervised release with me, I will crush

7    you.  I swear to God I will.  I mean it.  I will view that as

8    such a breach of faith and trust that I will sentence you to

9    the maximum in a heartbeat.  So I don't say that to be tough

10   and to posture, I'm saying that just so you understand there

11   will be no further crimes, period.

12        You are not to possess a firearm.  Of course you know

13   that already.  That's a crime.  It's also a violation of

14   supervised release.  You get double whacked if you get

15   prosecuted and sentenced for that.  You will also get violated

16   here and do three years on this consecutive to whatever you get

17   on that, and you will be an old man by the time you get out.

18        You're not allowed to possess drugs of any kind, any

19   kind of illegal substance.  That includes marijuana, that

20   includes other illicit drugs.  It also includes prescription

21   drugs for which you don't have a prescription.  So you may not

22   possess anything like that or use any kind of prescription

23   drugs.

24        You are to cooperate in the collection of DNA as

25   directed by the probation officer.  You will also have special

1    conditions, those conditions include that you will not incur

2    any credit charges or open lines of credit, that means

3    mortgages, credit card accounts, bank loans, anything like

4    that, without the permission of the probation officer.

5              You will also provide any requested financial

6    information to the probation officer.  So you have to make sure

7    that you're giving complete and accurate information to

8    probation just to make sure you don't get over your head

9    financially so you don't get put into a situation where you are

10   attempting to engage in criminal conduct.  It's for your own

11   safety.

12             You must submit your person, your residence, your

13   place of business, your vehicle, any other premises you

14   control, as well as your smartphone if you have one or your

15   tablet or laptop.  All of those things are subject to a search

16   in the event the probation officer thinks there may be evidence

17   of a crime or evidence of a violation of supervised release.

18   You can't decline.  You can't say no, I won't let you come in,

19   you have to allow it.

20             You have an obligation to advise any adults with whom

21   you share these premises of this condition.  So your wife is

22   here, she understands what we're talking about.  Any other

23   adults with whom you share the premises, you have to let them

24   know that their stuff, to the extent it is commingled with

25   yours, could also be searched.  And so they need to know that

1  so they can take steps to protect their own property and to

2  protect their own privacy.  Okay?

3          THE DEFENDANT:  Yes.

4          THE COURT:  That's on you.

5          You are not to associate in person, through the mail,

6  through email, telephone, texting, any means of communications,

7  you may not be in touch with or associating with anybody who is

8  affiliated with an organize crime enterprise or a gambling

9  enterprise or any other groups that are engaged in criminal

10  activity.  That's a condition, you can't be hanging out with

11  these guys, ever.  If you did, that's a violation.  Just

12  hanging out, just going bowling with one of these guys is

13  enough to be a violation and you will be back in front of me

14  and I will be pissed, so don't do that.  All right?

15          You will be supervised -- you live in Westchester, so

16  you will supervised -- is White Plains easier or Manhattan?

17          THE DEFENDANT:  White Plains, your Honor.

18          THE COURT:  So you will be supervised out of White

19  Plains.  So you will report to that same courthouse.  You will

20  be with probation up in White Plains.

21          As I said, I'm not going to impose a fine.  I am going

22  to order a $100 special assessment that's mandatory, you have

23  to pay that, as well as a $10,000 forfeiture of the proceeds of

24  this crime, which is already part of the judgment, the

25  forfeiture order in this case that's been docketed, but it's

1   now part of the judgment on the sentencing, and that's for

2   substitute assets, assets that were the proceeds of this crime

3   but which are now dissipated.  So you have to come up with that

4   money somehow.  You have to pay it over time, and you do have

5   to pay it.  I will get notice every time you pay, and that

6   means every month I expect to see something from you to show

7   that you're not blowing me off.  Okay?

8           THE DEFENDANT:  Yes, sir.

9           THE COURT:  All right.  There are open counts?

10          MS. KRAMER:  Yes, your Honor.  The government moves to

11  dismiss the open count in the underlying indictment.

12          THE COURT:  All right.  So I will dismiss the open

13  counts.  And I should advise you you have the right to appeal

14  this sentence, to the extent you haven't already waived that

15  right.  I think you have.  You agreed that you would not appeal

16  any sentence that was 46 months or below.  I sentenced you to

17  20.  And it's not -- I mean I didn't do it because I'm pitying

18  you, I'm doing it because I think that's the fair sentence for

19  the reasons I stated, including the fact you had this other

20  undischarged sentence.  But I think, as a result, you have

21  given up your right to appeal, you can't appeal this sentence

22  or otherwise challenge it.  If, however, you think you have a

23  legitimate basis for appeal, you need to file a notice of

24  appeal within two weeks.  Mr. Carnesi will help you with that,

25  but I think you probably waived that right.

1      As I said, I will let you surrender on April 3rd to

2  the facility that will be designated by the Bureau of Prisons.

3  In the meantime, continue to comply with all the conditions of

4  bail.  If you were to violate any of them, I will not hesitate

5  to put you in right away.

6      Is there anything else that we should cover today?

7  Anything else that I overlooked?

8      MS. KRAMER:  No, your Honor.

9      MR. CARNESI:  Judge, just one other thing, if the

10  Court would recommend a designation to the facility in Danbury,

11  that would be enable him to keep close contact with his wife

12  and daughter.

13      THE COURT:  All right.  I don't mind making that

14  recommendation.  My only hesitation is that everybody in this

15  case is asking me to recommend Danbury, but that's fine, it's

16  close, it makes it easy to visit, but it means you could be in

17  the same place with a lot of these other guys, and I don't want

18  you hanging with these guys.

19      THE DEFENDANT:  I'm done.

20      THE COURT:  It's a little beyond your control in a

21  prison setting.  At home you could get in your car and drive

22  away, you could close the door and not pick up the phone.  In

23  jail it's a little trickier.  I don't want you hanging with

24  these guys in jail.  So go to the library, stay away, but I

25  will recommend Danbury.

1          MR. CARNESI:  Thank you, your Honor.

2          THE COURT:  But nothing about mental health treatment,

3     drug treatment, anything like that?  Probation didn't recommend

4     it, I want to make sure the parties have a chance to be heard

5     on that.

6          MR. CARNESI:  No, your Honor.

7          THE COURT:  All right.  So I don't know if that's good

8     news or bad news for you.  I explained my reasons.  I think

9     this is a fair sentence.  There are times when people leave

10    very upset and think it was a harsh sentence, and other times

11    where they think wow, I thought he was going to come in a lot

12    higher than that.  I can't worry about that, I have to do the

13    best I can.

14          I do think that you have many admirable qualities,

15    Mr. Maiorino.  It's disturbing to me that you're now a

16    three-time convicted felon.  You got to make sure that you are

17    able to follow through on your better instincts, because you

18    have them, and you are capable of executing them.  You're

19    capable of holding a job and being a good father and a good

20    husband and being a good neighbor.  You're capable of those

21    things.  I can't understanding why a guy with that kind of

22    knowledge and that kind of ability is nonetheless still sort of

23    circling back into situations that put you and your family at

24    risk.  You just can't do it.

25          So use the time wisely.  Good luck to you and your

HCDTMAIS

1    family.  You have a daughter who sounds like a jewel who is

2    just a great kid that any father would be proud of.  So look,

3    you have a whole group of people here.  I sentence people in

4    empty rooms all the time.  So in many ways you are incredibly

5    blessed, and it gives me some confidence that you won't slide

6    back into criminal history because these folks will hopefully

7    prevent you from doing that.  But for most people, having a

8    teenage daughter is enough to keep them out of any kind of

9    criminal situation because the threat of separation is enough

10   to deter criminal conduct.

11        So you don't need more motivation to do it, you don't

12   need threats from me, you've got all the reasons you need to to

13   make your life productive.  So at this point you have got a lot

14   to look back on and say wow, I'm not proud of that.  Hopefully

15   for the rest of your life you could say well, I was proud of

16   what I did for the remainder, for the balance.  That's my hope

17   for you.  So good luck.  Good luck, everyone, have a good day.

18        MR. CARNESI:  Thank you, your Honor.

19        THE COURT:  Thank you, everyone.  Thank you for your

20   patience.  Let me thank the court reporter as well.

21                            o0o

22

23

24

25